## UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| AVITA DRUGS, LLC and PHARMBLUE SERVICES, INC.,           )<br>)<br>)<br>      Plaintiffs,   )<br>)<br>  v.             )<br>)<br>SAMANTHA POSSERT, GABRIEL SANTRY, and WESTIN SMITH,   )<br>)<br>      Defendants.   )<br>) | Civil Action No. __2:21-cv-1000__ |

### COMPLAINT

Plaintiffs Avita Drugs, LLC ("Avita") and PharmBlue Services, Inc. ("PharmBlue") (collectively, "Plaintiffs", "Avita" or the "Company"), allege as follows against the defendants Samantha Possert ("Possert"), Gabriel Santry ("Santry"), and Westin Smith ("Smith") (collectively, the "Defendants"):

### NATURE OF THE ACTION

1.     Avita, a nationwide provider of specialized contract pharmacy services, predominantly for clinics treating patients with HIV and AIDS, brings this action for damages and injunctive relief against three of its former employees, arising from various acts of misconduct, including violation of the Defend Trade Secrets Act, 18 U.S.C. § 1832, *et seq.* ("DTSA"), violation of the Pennsylvania Uniform Trade Secrets Act, 12 Pa. Stat. and Cons. Stat. Ann. § 5301, *et seq.* ("PTSA"), breach of contract, tortious interference with contract, tortious interference with business relations, breach of fiduciary duties, aiding and abetting breach of fiduciary duties, and commercial disparagement.

2. Defendants are each former legacy sales representatives of PharmBlue, a competitor that Avita acquired on April 6, 2020 (the "PharmBlue Acquisition"), and thus became employed by Avita following the acquisition. Although Defendants each executed agreements containing restrictions against the unauthorized use of confidential information, competition, solicitation of customers and employees, and disparagement, they each voluntarily left the Company after the PharmBlue Acquisition and immediately began working for Physicians Rx Pharmacy LLC, a direct competitor of Avita, and which on information and belief is an affiliate of PharmalyIQ, LLC (collectively, "PRx").

3. Possert, the most recent of the three departures, resigned effective April 30, 2021. When asked why she was leaving, Possert lied to Avita management, claiming that she wanted to have more personal time and had no plans to work anywhere else in the foreseeable future. Several weeks after she left, Avita learned that Possert had "wiped" her Avita laptop computer before returning it, in violation of Company policy, presumably in an effort to conceal any digital evidence of her misdeeds. Nevertheless, despite her attempts at deception, shortly after her departure, Avita learned that she not only joined PRx, but she had been actively soliciting Avita's customers to contract with PRx while she was still employed by Avita, in violation of her legal obligations to Avita.

4. Upon further investigation, Avita learned that Santry, Possert's former supervisor and who had already joined PRx in violation of his non-compete agreement, actively aided and abetted Possert's misconduct. A review of Avita's email servers revealed that in March 2021, while she was still employed by Avita, Possert participated in a videoconference call, together with Santry and an established Avita customer. That customer is now a PRx customer.

5.      Separately, Avita also recently learned from other customers that defendant Smith, who was also previously supervised by Santry and is now with PRx, is knowingly spreading misinformation about Avita.  Most recently, on July 14, 2021, Smith falsely represented to this customer that Avita had been purchased by a drug wholesaler, which posed a conflict of interest to Avita's customers, and accordingly the customer should not do business with Avita.  Smith's statements are categorically false.

6.      These unlawful actions, among others, knowingly and intentionally perpetrated by the Defendants have caused both serious monetary injury and irreparable harm to Avita.  Prior to 2020, PRx had almost no market presence in the industry, averaging only one new customer registration a year.  However, since 2020, when Santry and Smith left Avita to join PRx, over 20 covered entities have registered with PRx, 10 of which are Avita customers.

7.      Absent injunctive relief, Avita will continue to suffer irreparable injury, including the loss of customers, a competitive advantage, trade secrets and other intellectual property, and goodwill in amounts which may be impossible to determine.

## **THE PARTIES**

8.      Plaintiff Avita Drugs, LLC is a Louisiana limited liability company with its principal place of business located in Louisiana.  It is wholly owned by Avita Drugs, Inc., a Texas corporation.

9.      Plaintiff PharmBlue Services, Inc. is a Delaware corporation with its principal place of business located in Pennsylvania.

10.      Upon information and belief, Defendant Samantha Possert is a resident of the state of Florida.

11.     Upon information and belief, Defendant Gabriel Santry is a resident of the state of California.

12.     Upon information and belief, Defendant Westin Smith is a resident of the state of Illinois.

## JURISDICTION AND VENUE

13.     This Court has original subject matter jurisdiction under 28 U.S.C. § 1331 because this action involves federal claims arising under the DTSA, and supplemental jurisdiction under 28 U.S.C. § 1367 because all other claims are so related that they form part of the same case or controversy. In addition, this Court has original subject matter jurisdiction under 28 U.S.C. § 1332 as there exists complete diversity of citizenship between Plaintiffs on the one hand and Defendants on the other, and the amount in controversy exceeds $75,000, exclusive of interest and costs.

14.     This Court has personal jurisdiction over Possert and venue is proper in this District by reason of her execution of an employment agreement, which forms the basis of this dispute, in which she consented to jurisdiction of the state and federal courts located in Pennsylvania, as it designates the state and federal courts of Pennsylvania as the exclusive forum for any disputes thereunder.

15.     This Court has personal jurisdiction over Santry on the grounds that he tortiously interfered with Possert's employment agreement with Plaintiffs, which designates the state and federal courts of Pennsylvania as the exclusive forum for any disputes thereunder. In addition, Santry's own employment agreement with PharmBlue which also forms the basis of this dispute designates Pennsylvania law as controlling, and Santry executed other documents with PharmBlue under which he consented to the jurisdiction of the state and federal courts located in

Pennsylvania. Santry also resided in Pennsylvania in part during his employment with PharmBlue.

16. This Court has personal jurisdiction over Smith on the grounds that he tortiously interfered with Possert's employment agreement with Plaintiffs, which designates the state and federal courts of Pennsylvania as the exclusive forum for any disputes thereunder. In addition, Smith's own employment agreement with PharmBlue which also forms the basis of this dispute designates Pennsylvania law as controlling.

17. Moreover, general and specific jurisdiction exists against Defendants based on their continued and ongoing contacts with this jurisdiction, the fact that their new employer, PRx, is based in this District, and Defendants committed tortious acts against Plaintiffs and on PRx's behalf in Pennsylvania, and/or caused harm to Plaintiffs in Pennsylvania.

## ALLEGATIONS COMMON TO ALL COUNTS

### I. Plaintiffs' Business and Their Confidential and Trade Secret Information

18. Avita is a national pharmacy services organization that provides care for more than 100,000 patients through over 250 covered entity relationships at 58 pharmacies nationwide. Avita is the largest independent nationwide provider of pharmacy services and solutions for Ryan White/STD Grantees, AIDS Service Organizations, and Federally Qualified Health Centers (FQHCs).

19. Avita was founded in response to the historical lack of sensitivity on the part of certain pharmacies in relation to the LGBTQ community and other communities particularly impacted by HIV and AIDS, and specializes in care of patients in such communities. Avita prides itself in having a deep understanding of issues facing such patient populations, and provides an unparalleled level of service to such patients and the clients serving them.

20.    Most germane to this dispute, Avita contracts with various health clinics receiving federal grants that specialize in care for patients with HIV or AIDS to provide pharmacy services for such entities. Avita purchases prescription drugs from a wholesaler, and upon receiving a prescription from providers associated with its clinic customers, dispenses such drugs to the clinic's patients.

21.    The vast majority of Avita's contracts with its customers span several years, and contain confidential terms including pricing.

22.    Avita's pricing with its customers is made on an individual customer-by-customer basis, after an in-depth analysis of a variety of factors specific to each customer relationship, and is often the result of substantial negotiation with the customer. The process of determining customer-by-customer pricing requires significant time, effort, and expense on the part of Avita's employees, that often takes several months.

23.    In particular, Avita strives to be the preferred pharmacy for its clients, which is achieved through not only competitive pricing, but also marketing Avita's clinical expertise, particularly with respect to HIV treatment and prevention and focus on patient experience. Avita's expertise in this regard provides it with a distinct competitive advantage as compared to other contract pharmacies.

24.    Avita's pricing, the process by which Avita determines appropriate pricing for each relationship, and the underlying customer-specific information analyzed in connection with Avita's determination of appropriate customer pricing are highly confidential, not generally known to those outside the Company, and provide Avita with a strategic competitive advantage.

25.    In addition to its pricing information, Avita considers and treats information regarding its customers and prospects, and their patients, as highly confidential. This includes but

is not limited to customer-specific needs and preferences, contract terms, and patient experience models. Like its pricing information, this customer-specific information is highly confidential, not generally known to those outside the Company, and provides Avita with a strategic competitive advantage, as it allows Avita to leverage strong customer relationships in its business.

26.     In an effort to win new business, Avita also conducts analyses of prospective customers, including compiling prospect lists that prioritize Avita's efforts to solicit new customers based on the value of a business relationship with the prospective customer, the likelihood of winning such business, and other factors known only to Avita employees. Such lists are compiled at great effort, and are highly confidential and not known to those outside the Company. Such information provides Avita with a competitive advantage, as it guides Avita's strategy for targeting new prospects and the resources to be devoted to each such prospect.

27.     In addition, Avita's account executives develop close relationships with its customers and prospects through use of Avita's resources, including its compilation of customer-specific information. Given the niche nature of the industry, and the expertise necessary to navigate the world of pricing HIV- and AIDS-related drugs for covered entities, a significant amount of expertise, face time, and sensitivity to the community of patients is required with existing and potential customers. Avita spends substantial resources training its sales representatives and developing marketing techniques to further cultivate customer relationships.

28.     The protection of its customer relationships, reputation, and goodwill is thus an essential aspect of Avita's business, as those customer relationships are critical to Avita's success and strategic position in the industry.

29.     In the spring of 2020, Avita acquired PharmBlue, including its customer relationships, which maintained a similar business philosophy.

30.     Plaintiffs have spent a substantial amount of time and money in developing, acquiring, and protecting all of the foregoing confidential information and relationships, to which Plaintiffs' trusted personnel have access to enable them to cultivate customer relationships on the Company's behalf.

31.     The foregoing confidential, proprietary and/or trade secret information, which Avita purchased as part of the PharmBlue Acquisition, is not generally known to the public, and would give a competitor who acquired it an unfair competitive advantage by, among other things, not having to expend the time and resources to develop the customer relationships or information as Plaintiffs have done.

32.     Plaintiffs take great pains to protect their trade secrets, confidential and other proprietary information, including, among other safeguards: (a) requiring employees to sign confidentiality agreements; (b) requiring employees to sign agreements containing other restrictive covenants, such as non-competition and non-solicitation provisions; (c) storing information on password-protected desktop computers, servers, and off-site secure digital storage environments; (d) limiting access to confidential information to select employees only; and (e) requiring employees to return all Plaintiffs' information upon termination.

33.     The pharmacy services industry is highly competitive, and virtually all competitors in this industry use restrictive covenants to protect their legitimate business interests. Upon information and belief, the vast majority of pharmacy services providers use non-compete agreements with key personnel, including sales executives.

34.     PRx is a direct competitor of Avita, and is a relatively new entrant in the industry. PRx's website touts it as providing "high quality pharmacy services to providers looking to provide supplementary care to vulnerable populations," and claims to be "one of fastest growing

pharmacies in the nation," with "humble beginnings" and "multiple locations across the US" serving thousands of patients and covered entities "across the nation." *See* https://340bpharm.com/about-us/ (last visited July 26, 2021). PRx's website notes that it is currently servicing patients in over 40 states, including Pennsylvania. Upon information and belief, PRx is based in McKeesport, Pennsylvania.

## II.    The Defendants' Employment with Plaintiffs

### A.  Samantha Possert

35.    Possert became employed by PharmBlue on or around March 18, 2019 as a Regional Sales Representative.  PharmBlue was based in Cranberry, Pennsylvania, and her offer letter was sent to her by the Company's CEO, who was located in the Cranberry office. Upon information and belief, Possert returned her signed offer letter and accompanying new hire paperwork to the CEO in Cranberry.

36.    Prior to being hired by PharmBlue, Possert had never worked in the pharmacy services industry. During her employment with Plaintiffs, Possert's direct manager was Santry, until his departure from the Company in mid-2020.

37.    In connection with and as a condition of her employment with PharmBlue, Possert signed a Conditions of Employment Agreement (the "Possert Agreement") with PharmBlue, a copy of which is attached as Exhibit A hereto.

38.    The Possert Agreement provides, among other things, that it "creates a relationship of confidence and trust between [Possert] and the Company" with respect to its Proprietary Information, as well as confidential information of the Company's customers entrusted to the Company (collectively defined as "Confidential Information"). "Proprietary Information" is defined in the Possert Agreement as:

information which the Company possesses or to which the Company has rights. Proprietary Information includes by of example and without limitation, (i) any information, whether conveyed in written, graphic, oral or physical form, including, but not limited to trade secrets; product ideas; designs; configurations; processes; software; improvements; data; plans and strategies; sales and financial reports or forecasts; scientific knowledge; know-how; compilations; databases; prototypes; collaborations; inventions; techniques; business strategies; notes; analyses; studies; formulae; models; concepts; design concepts; products; business operations; customer and supplier lists; business relationships; specifications; drawings; working drawings; means of implementation and manufacture; cost and pricing data; bills; ideas; software materials; preprocessing and all other proprietary information; patent, trademark, and copyright applications; patentable or unpatentable or copyrightable descriptions of mathematics or any other written material referring to the same and (ii) any document, diagram, drawing, computer program, or other communication which is either marked "confidential" or "proprietary," either known or reasonably known by Employee to be confidential, that is learned or disclosed in the course of discussions, studies, or other work. Proprietary Information includes any information developed by Employee during the term of Employee's employment by the Company (the "Term"). Proprietary Information shall not include information which is generally known to the public or in the trade, unless such knowledge results from an unauthorized disclosure by Employee, but this exception will not affect the application of any other.

39.     The Possert Agreement further provides that both during and after her employment, she "will keep in confidence and trust all such Confidential Information, and will not use or disclose, directly or indirectly, any such Confidential Information without the written consent of the Company, except (y) as may be necessary in the ordinary course of performing [her] duties for the Company and (z) as may be required by court order, operation of law or government regulation . . . ."

40.     The Possert Agreement also provides at Section 3 that during her employment and for twelve months thereafter (the "Restricted Period"), she

shall not, directly or indirectly, except for and on behalf of the Company while [Possert] is an Employee to the Company, (a) provide any services for any Competing Enterprise within any state of the United States of America in which the Company then does business." "Competing Enterprise" is defined as "any person or entity engaged in the sale of products or services to pharmacies or 340B covered entities (those that qualify or that could qualify) that enable their participation in the 340B program within any state of the United States of America,

and any expansion thereof via organic and/or acquisition associated growth or under plans which are then being implemented by the Company.

41.     Section 4 of the Possert Agreement provides that during the Restricted Period, Possert:

> shall not, directly or indirectly, except for and on behalf of the Company while [Possert] is an Employee to the Company, (a) solicit, induce or attempt to induce any employee of the Company to leave the employ of such entity to take employment with any Competing Enterprise, (b) hire any person who is or was an employee of the Company unless twelve (12) months shall have elapsed since the last date of such person's employment with the Company or (c) induce or attempt to induce any customer, supplier or other business relation of the Company to reduce or eliminate their business with the Company, to terminate or modify any written or oral agreement or course of dealing with the Company, or to in any way interfere with the relationship between any such customer, supplier or business relation and the Company, including, without limitation, by soliciting any customer of the Company to direct business then provided by the Company to any competitor of the Company.

42.     Section 5 of the Possert Agreement provides that Possert:

> shall not in a public forum (including, without limitation, on the Internet, during lectures, to the media, via published material, to analysts or in comparable forums) criticize, denigrate, speak adversely of or otherwise disparage the Company, its members, directors, managers, officers, employees or affiliates, except to the extent required by law and then only after consultation with the Company, its members, directors, managers, officers, employees or affiliates, as applicable, to the greatest extent possible.

43.     The Possert Agreement also provides at Section 5 that any breach of the foregoing covenants would cause irreparable harm for which there is no adequate remedy at law, and that the Company would be "entitled to injunctive and/or other equitable relief to require specific performance or prevent a breach" thereof.

44.     That section further provides that in the event Possert breaches the Possert Agreement, she "agrees to pay the Company (a) all reasonable attorneys' fees and costs that the Company incurs" in enforcing the Possert Agreement, as well as all actual, compensatory, consequential, and punitive damages."

45.     Section 5 of the Possert Agreement also provides that the Restricted Period would "be extended by any period [Possert] is found to be in breach" of the covenants in Sections 3 and 4 of the Possert Agreement.

46.     Section 6 of the Possert Agreement provides that "[a]ll documents, records, apparatuses, equipment and other physical property, whether or not pertaining to Proprietary Information, which are furnished to [Possert] by the Company or are produced by [Possert] in connection with [the Possert] Agreement will be and remain the sole property of the Company. [Possert] will return to the Company all such materials and property as and when requested by the Company", in any event immediately upon termination of her employment. That section further provides that Possert "will not take or remove any such material or property or any copies thereof upon such termination."

47.     Section 10 of the Possert Agreement provides that she "will refrain from performing any act or engaging in any course of conduct which has or may reasonably be expected to have the effect of demeaning the name or business reputation of the Company or affects adversely or may reasonably be expected to affect adversely the Company's best interests, economic or otherwise."

48.     Section 11(b) of the Possert Agreement provides that it "shall be governed by and construed in accordance with the laws of the Commonwealth of Pennsylvania, notwithstanding the conflicts of law principles of any jurisdiction to the contrary. The Parties agree and understand that any action arising out of or related to this [Possert] Agreement shall be brought in the United States District Court for the Western District of Pennsylvania or the Court of Common Pleas of Allegheny County, Pennsylvania."

49.     Section 11(c) of the Possert Agreement provides that it "shall be binding upon and

inure to the benefit of the Company and its successors and assigns . . . ."

50.     In addition to the Possert Agreement, Possert signed an Employee and Contractor Confidentiality Attestation, by which she agreed to keep in confidence all Company Confidential Information (defined in that attestation as including the Company's "confidential business and proprietary information"), and further agreed to only access and use such information to the extent necessary to perform her duties to the Company.

51.     Following the PharmBlue Acquisition, Possert became an employee of Avita and held the position of Southeast Regional Sales Executive.  In that role, greater emphasis was placed on developing new business, given that her commissions were based entirely on new business development, and Avita had a separate team dedicated to maintaining existing relationships older than one year.

52.     Because of her position, Possert was placed in close contact with many of Avita's key customers and was often the direct point of contact for its customers.

53.     In her role as a sales representative with the Company, Possert had access to the Company's confidential and trade secret information identified above, including all customer information maintained on its Salesforce database.

**B.  Gabriel Santry**

54.     Santry became employed by PharmBlue in or around July of 2013 as Director of National Accounts, with a territory of Washington, Oregon, California, Arizona, and Nevada.  In that role, he reported to the Company's CEO, who was based in Pennsylvania. As Director of National Accounts, Santry was responsible for (1) prospecting and creating business relationships with physicians and medical treatment facilities in his assigned territories; (2) identifying, prioritizing, and pursuing new opportunities with current and future customers; (3) preparing sales

reports (including potential sales); (4) partnering with finance, customer service, and other internal departments to understand their strategic priorities and creatively identify opportunities to support those principles; and (5) achieving growth-oriented revenue goals and objectives.

55.     At the time Santry first became employed by PharmBlue, he was a resident of Pennsylvania and worked in the Company's Pennsylvania office.

56.     In connection with and as a condition of his employment with PharmBlue, Santry signed a Conditions of Employment Agreement (the "Santry Agreement") with PharmBlue, a copy of which is attached hereto as Exhibit B.

57.     The Santry Agreement provides, among other things, that it "creates a relationship of confidence and trust between [Santry] and the Company" with respect to its Proprietary Information, as well as confidential information of the Company's customers entrusted to the Company (collectively referred to as "Confidential Information"). "Proprietary Information" is defined in the Santry Agreement as is it in the Possert Agreement.

58.     The Santry Agreement further provides that both during and after his employment, he "will keep in confidence and trust all such Confidential Information, and will not use or disclose, directly or indirectly, any such Confidential Information without the written consent of the Company, except (y) as may be necessary in the ordinary course of performing [his] duties for the Company and (z) as may be required by court order, operation of law or government regulation . . . ."

59.     The Santry Agreement also provides at Section 3 that during the Restricted Period, he "shall not, directly or indirectly, except for and on behalf of the Company while [Santry] is an Employee to the Company, (a) provide any services for any Competing Enterprise within any state of the United States of America in which the Company then does business." "Competing

Enterprise" is defined as it is in the Possert Agreement.

60.     Section 4 of the Santry Agreement provides that during the Restricted Period, Santry:

> shall not, directly or indirectly, except for and on behalf of the Company while [Santry] is an Employee to the Company, (a) solicit, induce or attempt to induce any employee of the Company to leave the employ of such entity to take employment with any Competing Enterprise, (b) hire any person who is or was an employee of the Company unless twelve (12) months shall have elapsed since the last date of such person's employment with the Company or (c) induce or attempt to induce any customer, supplier or other business relation of the Company to reduce or eliminate their business with the Company, to terminate or modify any written or oral agreement or course of dealing with the Company, or to in any way interfere with the relationship between any such customer, supplier or business relation and the Company, including, without limitation, by soliciting any customer of the Company to direct business then provided by the Company to any competitor of the Company."

61.     Section 5 of the Santry Agreement provides that Santry "shall not in a public forum (including, without limitation, on the Internet, during lectures, to the media, via published material, to analysts or in comparable forums) criticize, denigrate, speak adversely of or otherwise disparage the Company, its members, directors, managers, officers, employees or affiliates, except to the extent required by law and then only after consultation with the Company, its members, directors, managers, officers, employees or affiliates, as applicable, to the greatest extent possible."

62.     Section 6 of the Santry Agreement provides that "[a]ll documents, records, apparatuses, equipment and other physical property, whether or not pertaining to Proprietary Information, which are furnished to [Santry] by the Company or are produced by [Santry] in connection with [the Santry] Agreement will be and remain the sole property of the Company. [Santry] will return to the Company all such materials and property as and when requested by the Company", in any event immediately upon termination of her employment. That section further provides that Santry "will not take or remove any such material or property or any copies thereof

upon such termination."

63.     Section 8 of the Santry Agreement provides that he "will refrain from performing any act or engaging in any course of conduct which has or may reasonably be expected to have the effect of demeaning the name or business reputation of the Company or affects adversely or may reasonably be expected to affect adversely the Company's best interests, economic or otherwise."

64.     Section 11(b) of the Santry Agreement provides that it "shall be governed by and construed in accordance with the laws of the Commonwealth of Pennsylvania, notwithstanding the conflicts of law principles of any jurisdiction to the contrary."

65.     Section 11(c) of the Santry Agreement provides that it "shall be binding upon and inure to the benefit of the Company and its successors and assigns . . . ."

66.     In July of 2015, Santry moved from Pennsylvania to California. However, even after this move, he continued to report to the Company's CEO in Pennsylvania.

67.     In September 2015, Santry was promoted to Regional Sales Manager. In this role, Santry reported to the CEO or Vice President of Sales, and was responsible for hiring and training sales directors to create business relationships with physicians and medical treatment facilities, identify prospects, close new business, and develop and manage those relationships. He was also personally responsible for, among other things, (1) directly and indirectly managing key customers and accounts, including developing a deep understanding of those customers' needs; (2) managing and directing a sales force to achieve sales and profit goals within his region; (3) identifying, prioritizing, and pursuing new opportunities with current and future customers; (4) preparing sales reports (including potential sales); (5) partnering with finance, customer service, and other internal departments to understand their strategic priorities and creatively identify

opportunities to support those principles; and (6) achieving growth-oriented revenue goals and objectives.

68.     Effective January 2, 2018, Santry was promoted to National Sales Manager, reporting to the CEO (who was based in Pennsylvania). The offer letter for this promotion was sent by the Company's CEO from its Cranberry, Pennsylvania office, and upon information and belief, Santry returned the signed offer letter to the same office.

69.     In that role, in addition to all his previous responsibilities, Santry was also responsible for, among other things, managing relationships with key customers and accounts; prospecting and creating business relationships with executive level staff of medical, behavioral health, AIDS services organizations, and other medical clinics; training and providing directly to Regional Sales Representatives and Account Managers to identify prospects; creating account-specific business plans and achieving established goals for the accounts such as sales, patient enrollment, first prescription shipment, refill prescription volume, and retention; and qualifying potential new clients via demographic research before presenting to the executive team for consideration.

70.     In February of 2019, Santry was notified that he would receive a retention bonus of $60,000, to be distributed on three separate dates ($15,000 on December 31, 2019, $20,000 on December 31, 2020, and $25,000 on December 31, 2021). The retention agreement expressly provided that its terms would be governed by Pennsylvania law, without regard to its conflicts of law provisions, and further provided that he would submit to the jurisdiction and venue of state and federal courts in Pennsylvania regarding any issues arising out of the retention bonus. The retention agreement further provided that the payments would be cancelled in the event that Santry competed with the Company, disclosed or improperly used its confidential or proprietary

information, solicited or recruited Company customers or employees, or disparaged the Company, among other "cancellation events." The retention agreement noted that the cancellation events were "designed, among other things, to incentivize compliance with the Company's policies . . . , to protect the Company's interests in non-public, confidential and/or proprietary information, products, trade secrets, customer relationships, and other legitimate business interests . . . ."

71.     Pursuant to the retention agreement, Santry was paid the first installment of $15,000.

72.     Following the PharmBlue Acquisition, Santry became an employee of Avita.

73.     Because of his position, Santry was placed in close contact with many of Avita's key customers and was often the direct point of contact for its customers.

74.     By virtue of his roles with the Company, Santry had access to the Company's confidential and trade secret information identified above, including all of Avita's customer information maintained on its Salesforce database.

**C. Westin Smith**

75.     Smith became employed by PharmBlue in or around March of 2017 as a Regional Sales Representative reporting to Santry, with a territory of Maine, Vermont, New Hampshire, Massachusetts, Connecticut, and New York.  In that role, Smith reported to Santry. Prior to being hired by PharmBlue, Smith had never worked in the pharmacy services industry.

76.     PharmBlue was based in Pennsylvania, and Smith's offer letter was sent by the Company's CEO from its Pennsylvania office, and upon information and belief, Smith returned the signed offer to that location.

77.     Smith further traveled to PharmBlue's office in Pennsylvania to attend sales

training and corporate meetings.

78.     In connection with and as a condition of his employment with PharmBlue, Smith signed a Conditions of Employment Agreement (the "Smith Agreement") with PharmBlue, a copy of which is attached hereto as Exhibit C.

79.     The Smith Agreement provides, among other things, that it "creates a relationship of confidence and trust between [Smith] and the Company" with respect to its Proprietary Information, as well as confidential information of the Company's customers entrusted to the Company (collectively referred to as "Confidential Information"). "Proprietary Information" is defined in the Smith Agreement as is it in the Possert Agreement.

80.     The Smith Agreement further provides that both during and after his employment, he "will keep in confidence and trust all such Confidential Information, and will not use or disclose, directly or indirectly, any such Confidential Information without the written consent of the Company, except (y) as may be necessary in the ordinary course of performing [his] duties for the Company and (z) as may be required by court order, operation of law or government regulation . . . ."

81.     The Smith Agreement also provides at Section 3 that during the Restricted Period, he "shall not, directly or indirectly, except for and on behalf of the Company while [Smith] is an Employee to the Company, (a) provide any services for any Competing Enterprise within any state of the United States of America in which the Company then does business." "Competing Enterprise" is defined as it is in the Possert Agreement.

82.     Section 4 of the Smith Agreement provides that during the Restricted Period, Smith:

> shall not, directly or indirectly, except for and on behalf of the Company while [Smith] is an Employee to the Company, (a) solicit, induce or attempt to induce any

employee of the Company to leave the employ of such entity to take employment with any Competing Enterprise, (b) hire any person who is or was an employee of the Company unless twelve (12) months shall have elapsed since the last date of such person's employment with the Company or (c) induce or attempt to induce any customer, supplier or other business relation of the Company to reduce or eliminate their business with the Company, to terminate or modify any written or oral agreement or course of dealing with the Company, or to in any way interfere with the relationship between any such customer, supplier or business relation and the Company, including, without limitation, by soliciting any customer of the Company to direct business then provided by the Company to any competitor of the Company."

83.     Section 5 of the Smith Agreement provides that Smith "shall not in a public forum (including, without limitation, on the Internet, during lectures, to the media, via published material, to analysts or in comparable forums) criticize, denigrate, speak adversely of or otherwise disparage the Company, its members, directors, managers, officers, employees or affiliates, except to the extent required by law and then only after consultation with the Company, its members, directors, managers, officers, employees or affiliates, as applicable, to the greatest extent possible."

84.     Section 6 of the Smith Agreement provides that "[a]ll documents, records, apparatuses, equipment and other physical property, whether or not pertaining to Proprietary Information, which are furnished to [Smith] by the Company or are produced by [Smith] in connection with [the Smith] Agreement will be and remain the sole property of the Company. [Smith] will return to the Company all such materials and property as and when requested by the Company", in any event immediately upon termination of her employment. That section further provides that Smith "will not take or remove any such material or property or any copies thereof upon such termination."

85.     Section 8 of the Smith Agreement provides that he "will refrain from performing any act or engaging in any course of conduct which has or may reasonably be expected to have the effect of demeaning the name or business reputation of the Company or affects adversely or

may reasonably be expected to affect adversely the Company's best interests, economic or otherwise."

86.     Section 11(b) of the Smith Agreement provides that it "shall be governed by and construed in accordance with the laws of the Commonwealth of Pennsylvania, notwithstanding the conflicts of law principles of any jurisdiction to the contrary."

87.     Section 11(c) of the Smith Agreement provides that it "shall be binding upon and inure to the benefit of the Company and its successors and assigns . . . ."

88.     Following the PharmBlue Acquisition, Smith became an employee of Avita.

89.     Because of his position, Smith was placed in close contact with many of Avita's key customers and was often the direct point of contact for its customers.

90.     Additionally, by virtue of his employment with Plaintiffs, Smith had access to the Company's confidential and trade secret information identified above, including customer information maintained on Avita's Salesforce database.

### III.     Resignations of Santry,  Smith, and Tina Le from Avita

91.     In April of 2020, Santry resigned from Avita, effective April 30, 2020. At the time his employment terminated, Avita provided him with a copy of the Santry Agreement.

92.     Later, Avita learned that Santry had joined PRx as its Vice President of Sales and Marketing. Upon information and belief, Santry's role for PRx is substantially similar to his most recent role with Avita.

93.     On June 29, 2020, Avita sent Santry a letter advising that he was still bound by the terms of the Santry Agreement.

94.     Similarly, on April 23, 2020, another Avita employee who reported to Santry, Tina Le ("Le"), resigned from Avita, effective immediately. Le was subject to an employment

agreement with Plaintiffs that contained substantially identical terms as those in the Possert Agreement, the Santry Agreement, and the Smith Agreement (collectively, the "Agreements"). Later, Avita learned that Le had joined PRx as its Director of Strategic Sales. Upon information and belief, Le's role for PRx is substantially similar to her role with Avita.

95.     On April 23, 2020, the same day that Le submitted her resignation, Smith also resigned from Avita, effective May 1, 2020, by emailing an Avita HR specialist located in Pennsylvania. At the time his employment terminated, Avita provided him with a copy of the Smith Agreement.

96.     Later, Avita learned that Smith had joined PRx as a Strategic Sales Director. On June 29, 2020, Avita sent Smith a letter advising that he was still bound by the terms of the Santry Agreement. Upon information and belief, Smith's role for PRx is substantially similar to his role with Avita.

97.     Upon information and belief, Santry solicited Smith and Le to resign from Avita and join PRx, in violation of their respective agreements with Plaintiffs, and in violation of Santry's own agreement.

**IV.     Possert's Resignation From Avita**

98.     On April 20, 2021, almost exactly a year after Santry, Smith, and Le resigned, Possert advised Avita that she would be resigning, effective April 30, 2021. When she informed Avita of her impending resignation, Possert was pregnant, and told her superiors that she was resigning simply to spend more time with her family and focus on the remainder of her pregnancy and upcoming maternity leave. Possert denied that she was accepting another job.

99.     Avita would later discover that Possert's representation was false. Rather than leaving the workforce to spend time with her family as she had represented, Possert had in fact accepted a position with PRx.

100.     In fact, Avita would later learn that Possert had received an offer from PRx on April 16, 2021, which she accepted the same day. At no point after her acceptance did she advise Avita that she would actually be accepting a role with a competitor.

101.     However, a number of incidents roused Avita's suspicion.  First, following Possert's departure, the Company repeatedly wrote to her requesting that she immediately return her laptop, per Company policy.  Possert did not return the computer until May 26, 2021, nearly a month after her last day (and, as Avita would later learn, weeks after she had commenced employment with PRx).

102.     Then, on May 27, 2021, Avita's servers received an email from Santry that was intended for Possert, but was erroneously sent to Possert's Avita email address.  Smith and Le were also included on that email on their PRx email addresses.  That email gave Avita cause to believe that Possert had teamed up with Santry, Smith, and Le at PRx.

103.     Finally, Avita learned that Possert had informed one of her Avita coworkers of her plans to join PRx (as well as her plans to lie about it to Avita). One or more of the Defendants had solicited this Avita employee to join PRx as well, but she declined to join. Avita only learned of Possert's disclosure to this individual, and Defendants' attempts to solicit her, well after Possert had resigned, when the aforementioned Avita employee came forward after Possert attempted to poach an Avita customer for whom the employee was responsible.

104.     Upon information and belief, Santry and Smith solicited Possert to leave Avita and join PRx. Additionally, upon information and belief, Santry and Smith instructed and/or encouraged Possert to lie to Avita about her future plans with PRx.

105.     Upon information, all (or substantially all) of PRx's sales team is now comprised of former Avita or PharmBlue employees.

106.     Following Avita's discovery of Possert's deception, it conducted a forensic examination of her Company-issued computer. That examination revealed that on or about May 24, 2021, right before shipping the laptop back to Avita and weeks after becoming employed by PRx, she had reinstalled Windows on the computer before returning it, thus effectively wiping any evidence of her activities and other Company data on that computer, including whether she extracted, downloaded, copied, disseminated, or otherwise misused Company data.

107.     Possert's conduct regarding her computer prior to returning it was highly suspicious to Avita. First, she had not asked anyone at Avita if she could wipe her computer. Second, there was no company culture by which Possert would have believed it was appropriate to remove any data on her computer prior to returning it. In fact, the Possert Agreement required Possert to return all Company data to the Company upon her termination, and Company policy dictated that wiping electronic devices was prohibited. Finally, the fact that Possert waited several weeks after her last day with Avita to wipe and return the computer led Avita to believe that she had used the information thereon in connection with her PRx employment.

108.     Upon information and belief, Possert intentionally deleted evidence on her computer to avoid Avita learning of her misconduct and deception.

109.     Upon information and belief, Santry and/or Smith encouraged or assisted Possert in wiping her computer, or were aware of her conduct in doing so.

110. Upon information and belief, prior to wiping her computer, Possert accessed and/or transferred confidential and/or trade secret Avita information that would be beneficial to PRx.

111. In light of the foregoing, Avita's counsel sent separate letters to Possert and PRx on June 11, 2021 alerting them to, among other things, the fact that it had learned Possert's representations regarding her future plans were false, and that the analysis of Possert's Avita computer had revealed her conduct in destroying all evidence thereon.

112. On June 14, 2021, in response to the foregoing letter, PRx responded, through counsel, that it was looking into the allegations set forth in the earlier letter.

113. The following day, PRx's counsel sent another response to Avita's counsel. The June 15, 2021 letter advised that the offer letter sent to Possert on April 16, 2021 (which was attached to counsel's correspondence) stated that Possert would be prohibited from using or disclosing confidential information of any prior employers. That letter also represented that upon signing the offer letter, Possert represented that she was not subject to any non-compete in connection with her employment with Avita. The letter did not state whether PRx had inquired if Possert owed any non-solicitation obligations to Avita.

114. The offer letter provided by PRx's counsel stated that as a condition of her employment with PRx, Possert would be required to sign a confidentiality and non-disclosure agreement. Upon information and belief, Possert did in fact sign such an agreement with PRx in connection with her employment.

115. Upon information and belief, the other Defendants also signed confidentiality and non-disclosure agreements in connection with their PRx employment.

116.     PRx's letter also revealed that Possert had been employed by PRx since May of 2021 (even though the evidence available to Avita shows that she acted as PRx's agent as early as March 2021). Despite this, Possert never updated her LinkedIn profile to show that she was employed by PRx, in an attempt to avoid detection by Avita.

117.     PRx's letter represented that based on review of the Possert Agreement that had accompanied Avita's June 11, 2021 letter, it had terminated Possert's employment. Finally, the letter advised that counsel would be unavailable until July 1, 2021 to discuss the matter further, and gave no directions as to whom at her firm Avita could reach in her absence.

118.     Upon information and belief, PRx's claim that it was unaware of Possert's restrictive covenants is untrue. Indeed, Santry, Smith, and Le all were bound by similar restrictive covenants agreements, and all were provided with a copy thereof upon their resignation. Likewise, Avita sent correspondence to Santry and Smith regarding their continuing obligations in June of 2020. Additionally, as noted above, restrictive covenants (including non-compete agreements) are regularly used in the industry. Thus, on information and belief, PRx was aware or should have been aware that the Avita employees it had recruited were all bound by similar agreements and restrictive covenants.

119.     At a minimum, Santry, Smith, and Le were all aware of Possert's continuing obligations to Avita when they recruited her to leave Avita and join PRx.

120.     In addition, the Company has reason to believe that Possert is still affiliated with PRx (or will be again in the near future). On information and belief, given Possert's impending maternity leave, PRx's "termination" of Possert is likely an effort to merely buy time until Possert is ready to return to the workplace, at which point PRx may attempt to rehire her and leverage the confidential Avita information she is in possession of for its own business. Indeed, given Possert's

lies and PRx's presumed knowledge of her restrictive covenants, Avita has no reason to believe that PRx's representations are true.

121.    After sending its June 11, 2021 letter to Possert, Avita conducted additional analysis of Possert's conduct during her last months as an Avita employee. During that investigation, Avita learned that on March 5, 2021, more than 6 weeks before she would even submit her notice of resignation to Avita, Possert had joined a videoconference with an Avita customer for which she was responsible, "Customer X", along with Santry – who at that point had been employed by PRx for approximately 11 months. There is no legitimate reason why Possert, while employed by Avita, would have joined a call with Customer X and Santry, an employee of an Avita competitor.

122.    Upon information and belief, Possert was aware that Customer X had recently had some concerns regarding its business relationship with Avita. While these concerns were more properly with a third party provider, and in any event were promptly addressed by Avita to Customer X's satisfaction, upon information and belief Possert used the knowledge of Customer X's concerns to assist PRx and the other Defendants in convincing Customer X to do business with PRx.

123.    Customer X would later enter into a contract with PRx, on information and belief due to the solicitation of Santry and Possert. Notably, at that point, Santry was still bound by his non-compete and non-solicitation obligations to Avita, which did not expire until April 30, 2021.

124.    Avita's investigation also revealed that on May 5, 2021, just a few days after her last day as an Avita employee, Possert joined a videoconference call with the other Defendants and Le using her Avita email address. Upon information and belief, this reveals that the Defendants are working together at PRx, likely in an attempt to obtain Avita's business.

125.     In addition to the foregoing, the executive director of another Avita customer ("Customer Y") recently informed one of Avita's account executives, David Swierczewski ("Swierczewski") that it had learned that Avita had been purchased by a company called Cardinal Health ("Cardinal"). Cardinal is a drug wholesaler that ships the prescription drugs needed by the patients serviced in the clinics that are Avita customers. Avita has recently transitioned all of its customers to using Cardinal to provide better cost savings to those customers, and accordingly has asked its customers to sign paperwork relating to this transition. Customer Y's representative indicated that based on the information she had heard, Avita's request that Customer Y execute the paperwork to transition to Cardinal constituted a conflict of interest, and that she had been advised by a third party not to sign the paperwork as a result.

126.     The representation conveyed by Customer Y that Avita had been purchased was false. Avita has not been purchased by Cardinal, and is not in any discussions to be purchased by Cardinal (or any other company).

127.     Similarly, Customer Y informed Swierczewski that it had been informed by the same third party that Avita was undergoing internal turmoil, and expressed concerns regarding Avita's ability to continue to provide top-notch services to its customers. Again, this representation was false.

128.     Customer Y was hesitant to share who it had heard the aforementioned misrepresentations from, but indicated to Swierczewski that it was "people you know, wink wink."

129.     Upon information and belief, Smith, with the other Defendants' knowledge, encouragement, and participation, was the source of the misrepresentations to Customer Y, as

Swierczewski was a legacy PharmBlue employee who worked closely with the Defendants, including Smith.

130.    Similarly, on July 14, 2021, the founder and executive director of another Avita customer ("Customer Z") informed Swierczewski that Smith had advised Customer Z not to complete the Cardinal paperwork that Avita had asked it to sign, because Avita is being bought by Cardinal and thus the paperwork was actually a pharmacy services agreement with Cardinal. This, too, was false.

131.    Customer Z has recently become a new customer of PRx.

132.    Upon information and belief, the foregoing misrepresentations were knowingly made in an effort to unlawfully interfere with Avita's business relationships for Defendants' own benefit and PRx's. Indeed, the representative of Customer Y also mentioned in her conversation that the individuals that Swierczewski knew who had advised her of the alleged Cardinal purchase and internal Avita turmoil had offered Customer Y a better rate, prompting Customer Y to ask Avita to match it.

133.    As a result of such misrepresentations, Avita has been required to spend significant time assuring its customers that there is no internal turmoil nor any impending (or anticipated) sale, in order to retain their business. For example, following Swierczewski's conversation with Customer Y, he scheduled another call with Customer Y's representative and Jennifer Kirschbaum ("Kirschbaum"), Avita's Area Vice President of Account Management, East. Kirschbaum and Swierczewski explained the Company's relationship with Cardinal and assured Customer Y's representative that what she had heard about Avita was not true.

134.    In addition to the foregoing, at least 20 Avita customers who were formerly PharmBlue customers have recently approached it and asked for a reduction in the contractually-

agreed upon rates. All of these customers have advised that a "competitor" has offered its services at a lower rate, and in each instance, cited the exact same pricing structure offered by the competitor.

135.     Upon information and belief, the "competitor" that has approached these 20 Avita customers is PRx, and given that PRx's entire salesforce is comprised of Santry, Smith, Le, and Possert -- all former Avita employees -- these customers would necessarily have to have been solicited by one of them. Additionally, on information and belief, the Defendants are using confidential Avita information to solicit these entities and undercut Avita's pricing.

136.     As a result of Defendants' solicitation of the aforementioned Avita customers, Avita has had to spend significant time and energy negotiating with those customers, despite the fact that they are subject to pre-existing contract terms that normally would not be renegotiated for 3 to 5 years. Many of these negotiations are ongoing, but Avita has already been forced to agree to alter its pricing as to certain customers, resulting in less revenue to Avita, which would not have occurred without Defendants' interference with Avita's customer relationships,

137.     Several Avita customers have started to send PRx increasing amounts of their business to Avita's detriment. On information and belief, such business has been lost due to the Defendants' unlawful solicitation.

## V.     Irreparable Harm

138.     Due to Defendants' conduct, Avita stands to lose an incalculable amount of dollars in business and the loss of value of its goodwill, customer relationships, trade secrets, and confidential and proprietary information, which cannot be adequately addressed at law.

139. Defendants' conduct is particularly egregious in that Avita just paid millions of dollars last year for the trade secrets, confidential information, goodwill, and customer relationships that Defendants usurped and are threatening to steal.

140. All told, the Defendants are causing, threatening, and/or will continue to cause or threaten significant irreparable harm to Plaintiffs, including the loss of value of confidential and/or trade secret information, the loss of long standing customer relationships, and loss of goodwill.

141. Money alone cannot make Plaintiffs whole.

## COUNT I
**(Misappropriation of Trade Secrets Under the Defend Trade Secrets Act, 18 U.S.C. § 1832 – Against Possert)**

142. Plaintiffs repeat and re-allege each and every allegation contained in the preceding paragraphs of the Complaint as if fully set forth herein.

143. By virtue of her employment with, and the performance of her responsibilities for Plaintiffs, Possert was given access to and possessed trade secrets and confidential information of Plaintiffs, including *inter alia*, access to confidential customer contracts and information relating to Plaintiffs' customers, customer needs, service histories and preferences, pricing, and margins, among other information.

144. Such information was developed and maintained at great time, cost and expense to Plaintiffs, and is the subject of significant efforts to protect the secrecy thereof.

145. Plaintiffs derive independent economic value from the trade secrets and confidential information entrusted to the Defendants; such information is not generally known or readily ascertainable by proper means by other persons who can obtain economic value from its disclosure and use, and the information is the subject of significant efforts to maintain its secrecy.

146.     Such information is considered a trade secret under the DTSA because Plaintiffs derive independent economic value from this information not being generally known to the public, the information is not readily ascertainable by proper means by persons who could obtain economic value from its disclosure or use, and the information is the subject of reasonable efforts to maintain its secrecy.

147.     Possert acquired Plaintiffs' trade secrets by improper means and without authorization.

148.     Possert has used and/or disclosed Plaintiffs' trade secrets for the benefit of PRx, the other Defendants, or herself, without express or implied consent.

149.     Possert knew or should have known that the information, as described, (1) is confidential; (2) was acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use; (3) was developed or acquired by Plaintiffs at great expense and effort; (4) was maintained as confidential and is not generally available to the public and Plaintiffs' competitors; (5) would provide significant benefit to a competitor seeking to compete with Plaintiffs; and (6) is critical to Plaintiffs' ability to conduct their business successfully.

150.     Possert actually misappropriated and/or threatened to misappropriate Plaintiffs' trade secrets and confidential information without Plaintiffs' consent.

151.     Possert will be or is unjustly enriched by the misappropriation of Plaintiffs' trade secrets and confidential information, and, unless restrained, will continue to threaten to use, actually use, divulge, inevitably disclose, acquire and/or otherwise misappropriate Plaintiffs' trade secrets and confidential information, to compete unfairly with Plaintiffs.

152.     As a result of the threatened and/or actual misappropriation of Plaintiffs' trade secrets and confidential information, Plaintiffs will be threatened with loss of business

expectancies, customers, their trade secrets and goodwill in amounts which may be impossible to determine, unless Possert is enjoined and restrained by order of the Court.

153.    In addition, Plaintiffs seeks actual, incidental, compensatory, punitive and consequential damages, along with reasonable attorneys' fees and costs in an amount to be determined at trial.

## COUNT II
### (Misappropriation of Trade Secrets Under the Pennsylvania Uniform Trade Secrets Act, 12 Pa. Stat. and Cons. Stat. Ann. § 5301, *et seq.* – Against Possert)

154.    Plaintiffs repeat and re-allege each and every allegation contained in the preceding paragraphs of the Complaint as if fully set forth herein.

155.    By virtue of her employment with, and the performance of her responsibilities for Plaintiffs, Possert was given access to and possessed trade secrets and confidential information of Plaintiffs, including *inter alia*, access to confidential customer contracts and information relating to Plaintiffs' customers, customer needs, service histories and preferences, pricing, and margins, among other information.

156.    Such information was developed and maintained at great time, cost and expense to Plaintiffs, and is the subject of significant efforts to protect the secrecy thereof.

157.    Plaintiffs derive independent economic value from the trade secrets and confidential information entrusted to the Defendants; such information is not generally known or readily ascertainable by proper means by other persons who can obtain economic value from its disclosure and use, and the information is the subject of significant efforts to maintain its secrecy.

158.    Such information is considered a trade secret under the PTSA because Plaintiffs derive independent economic value from this information not being generally known to the public, the information is not readily ascertainable by proper means by persons who could obtain

economic value from its disclosure or use, and the information is the subject of reasonable efforts to maintain its secrecy.

159. Possert acquired Plaintiffs' trade secrets by improper means and without authorization.

160. Possert has used and/or disclosed Plaintiffs' trade secrets for the benefit of PRx, the other Defendants, or herself, without express or implied consent.

161. Possert knew or should have known that the information, as described, (1) is confidential; (2) was acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use; (3) was developed or acquired by Plaintiffs at great expense and effort; (4) was maintained as confidential and is not generally available to the public and Plaintiffs' competitors; (5) would provide significant benefit to a competitor seeking to compete with Plaintiffs; and (6) is critical to Plaintiffs' ability to conduct their business successfully.

162. Possert actually misappropriated and/or threatened to misappropriate Plaintiffs' trade secrets and confidential information without Plaintiffs' consent.

163. Possert will be or is unjustly enriched by the misappropriation of Plaintiffs' trade secrets and confidential information, and, unless restrained, will continue to threaten to use, actually use, divulge, inevitably disclose, acquire and/or otherwise misappropriate Plaintiffs' trade secrets and confidential information, to compete unfairly with Plaintiffs.

164. As a result of the threatened and/or actual misappropriation of Plaintiffs' trade secrets and confidential information, Plaintiffs will be threatened with loss of business expectancies, customers, their trade secrets and goodwill in amounts which may be impossible to determine, unless Possert is enjoined and restrained by order of the Court.

165.     In addition, Plaintiffs seeks actual, incidental, compensatory, punitive and consequential damages, along with reasonable attorneys' fees and costs in an amount to be determined at trial.

## COUNT III
### (Breach of Contract – Against Possert)

166.     Plaintiffs repeats and re-alleges each and every allegation contained in the preceding paragraphs of the Complaint as if fully set forth herein.

167.     PharmBlue and Possert entered into the Possert Agreement during Possert's employment with PharmBlue.

168.     The benefits and obligations contained in the Possert Agreement accrued to Avita, as PharmBlue's successor in interest, after the PharmBlue Acquisition.

169.     The covenants contained in the Possert Agreement remain in full force and effect and are supported by good consideration.

170.     By the acts described above, Possert breached the Possert Agreement by accepting employment with Plaintiffs' competitor, PRx, within one year of termination of her employment with Avita.

171.     Possert also breached the Possert Agreement by soliciting Plaintiffs' customers to limit their relationships with Plaintiffs and move their business to PRx, within one year of termination of her employment with Avita.

172.     Possert also breached the Possert Agreement by soliciting Avita employees to terminate their employment with Avita, within one year of termination of her employment with Avita.

173.     Possert further breached the Possert Agreement by destroying all data on her Company-issued computer prior to returning it.

174. Possert also breached the Possert Agreement by retaining and using Plaintiffs' information for any purpose outside of the scope of her employment with Plaintiffs.

175. As a result of Possert's breaches of contract, Plaintiffs have suffered monetary damages and have suffered substantial and irreparable harm and are threatened with further substantial and irreparable harm due to the loss of trade secrets, confidential information, and customer goodwill, for which there is no adequate remedy at law to compensate.

176. In addition, Plaintiffs seek actual, incidental, compensatory, punitive and consequential damages, along with reasonable attorneys' fees and costs in an amount to be determined at trial.

## COUNT IV
### (Breach of Contract – Against Santry)

177. Plaintiffs repeats and re-alleges each and every allegation contained in the preceding paragraphs of the Complaint as if fully set forth herein.

178. PharmBlue and Santry entered into the Santry Agreement during Santry's employment with PharmBlue.

179. The benefits and obligations contained in the Santry Agreement accrued to Avita, as PharmBlue's successor in interest, after the PharmBlue Acquisition.

180. The covenants contained in the Santry Agreement remain in full force and effect and are supported by good consideration.

181. By the acts described above, Santry breached the Santry Agreement by accepting employment with Plaintiffs' competitor, PRx, within one year of termination of his employment with Avita.

182.     Santry also breached the Santry Agreement by soliciting Plaintiffs' customers to limit their relationships with Plaintiffs and move their business to PRx, within one year of termination of his employment with Avita.

183.     Santry also breached the Santry Agreement by soliciting Avita employees to terminate their employment with Avita, within one year of termination of his employment with Avita.

184.     Santry also breached the Santry Agreement by retaining and using Plaintiffs' information for any purpose outside of the scope of his employment with Plaintiffs.

185.     As a result of Santry's breaches of contract, Plaintiffs have suffered monetary damages and have suffered substantial and irreparable harm and are threatened with further substantial and irreparable harm due to the loss of trade secrets, confidential information, and customer goodwill, for which there is no adequate remedy at law to compensate.

186.     In addition, Plaintiffs seek actual, incidental, compensatory, punitive and consequential damages, along with reasonable attorneys' fees and costs in an amount to be determined at trial.

## COUNT V
### (Breach of Contract – Against Smith)

187.     Plaintiffs repeats and re-alleges each and every allegation contained in the preceding paragraphs of the Complaint as if fully set forth herein.

188.     PharmBlue and Smith entered into the Smith Agreement during Smith's employment with PharmBlue.

189.     The benefits and obligations contained in the Smith Agreement accrued to Avita, as PharmBlue's successor in interest, after the PharmBlue Acquisition.

190.    The covenants contained in the Smith Agreement remain in full force and effect and are supported by good consideration.

191.    By the acts described above, Smith breached the Smith Agreement by accepting employment with Plaintiffs' competitor, PRx, within one year of termination of his employment with Avita.

192.    Smith also breached the Smith Agreement by soliciting Plaintiffs' customers to limit their relationships with Plaintiffs and move their business to PRx, within one year of termination of his employment with Avita.

193.    Smith also breached the Smith Agreement by soliciting Avita employees to terminate their employment with Avita, within one year of termination of his employment with Avita.

194.    Smith also breached the Smith Agreement by retaining and using Plaintiffs' information for any purpose outside of the scope of his employment with Plaintiffs.

195.    Smith also breached the Smith Agreement by disparaging Avita to its customers.

196.    As a result of Smith's breaches of contract, Plaintiffs have suffered monetary damages and have suffered substantial and irreparable harm and are threatened with further substantial and irreparable harm due to the loss of trade secrets, confidential information, and customer goodwill, for which there is no adequate remedy at law to compensate.

197.    In addition, Plaintiffs seek actual, incidental, compensatory, punitive and consequential damages, along with reasonable attorneys' fees and costs in an amount to be determined at trial.

<u>**COUNT VI**</u>
**(Commercial Disparagement – Against Smith)**

198.    Plaintiffs repeats and re-alleges each and every allegation contained in the

preceding paragraphs of the Complaint as if fully set forth herein.

199.     Smith has made false statements regarding Avita and its business as set forth above.

200.     By making such false statements, Smith intended to cause Avita pecuniary losses.

201.     Because of Smith's false statements, Avita has in fact suffered pecuniary losses.

202.     Smith made the false statements with knowledge of their falsity or in reckless disregard of their truth or falsity.

203.     If not enjoined by this Court, Smith will continue to make false statements regarding Avita in an effort to cause injury to it.

204.     In addition, Plaintiffs seek actual, incidental, compensatory, punitive and consequential damages, in an amount to be determined at trial.

**<ins>COUNT VII</ins>**
**(Tortious Interference – Against Santry and Smith)**

205.     Plaintiffs repeat and re-allege each and every allegation contained in the preceding paragraphs of the Complaint as if fully set forth herein.

206.     As set forth above, the Agreements are valid and enforceable contracts. The post-employment activity covenants, confidentiality covenants, and other provisions contained in the Agreements are reasonable in scope and duration and are reasonably necessary to protect Plaintiffs' legitimate protectable interests in employee relationships, client relationships, and confidential information, as well as their goodwill.

207.     Santry and Smith were all fully aware of each other's Agreements, Le's agreement, and the Possert Agreement.

208.     Despite having knowledge of the Agreements, Santry induced, permitted, or incentivized Le, Smith, and Possert to violate their contractual obligations to Plaintiffs, without

justification, by among other things, encouraging and supporting their acceptance of employment with PRx, their solicitation of Plaintiffs' customers and employees, and their retention and/or misuse of Plaintiffs' confidential information.

209. Despite having knowledge of the Agreements, Smith induced, permitted, or incentivized Possert to violate her contractual obligations to Plaintiffs, without justification, by among other things, encouraging and supporting her acceptance of employment with PRx, her solicitation of Plaintiffs' customers and employees, and her retention and/or misuse of Plaintiffs' confidential information.

210. Santry's and Smith's intentional interference was willful, malicious, unjustified and accomplished through wrongful means, and was accomplished for an improper purpose, including to cause damage to Plaintiffs and their lawful businesses.

211. As a result of Santry's and Smith's intentional interference, Plaintiffs have suffered monetary damages and have suffered substantial and irreparable harm and are threatened with further substantial and irreparable harm due to the loss of trade secrets, confidential information, and customer goodwill, for which there is no adequate remedy at law to compensate.

212. In addition, Plaintiffs seek actual, incidental, compensatory, punitive and consequential damages, along with reasonable attorneys' fees and costs in an amount to be determined at trial.

**COUNT VIII**
**(Tortious Interference – Against All Defendants)**

213. Plaintiffs repeat and re-allege each and every allegation contained in the preceding paragraphs of the Complaint as if fully set forth herein.

214. As set forth above, Plaintiffs maintained valid business relationships, or the expectancy of business relationships, with their customers, including Customers X, Y, and Z.

Plaintiffs had the reasonable expectation that these relationships and prospective relationships would continue and would not be unjustifiably disrupted.

215.     Defendants were and remain aware of these customer relationships and/or expectancies.

216.     Notwithstanding their knowledge of the existence of these relationships and expectancies, Defendants intentionally and unjustifiably interfered with Plaintiffs' business relationships with its customers, including Customers X, Y, and Z, by soliciting them to limit their relationships with Plaintiffs, renegotiate their previously agreed-to contracts, and/or move their business to PRx in an unlawful manner.

217.     Defendants' intentional interference with those relationships was willful, malicious, unjustified and accomplished through wrongful means, and was accomplished for an improper purpose, including to cause damage to Plaintiffs and their lawful businesses.

218.     As a result of Defendants' intentional interference, Plaintiffs have suffered monetary damages and have suffered substantial and irreparable harm and are threatened with further substantial and irreparable harm due to the loss of trade secrets, confidential information, and customer goodwill, for which there is no adequate remedy at law to compensate.

219.     In addition, Plaintiffs seek actual, incidental, compensatory, punitive and consequential damages, along with reasonable attorneys' fees and costs in an amount to be determined at trial.

## COUNT IX
### (Breach of Fiduciary Duty – Against Possert)

220.     Plaintiffs repeat and re-allege each and every allegation contained in the preceding paragraphs of the Complaint as if fully set forth herein.

221.     In her role as an employee of Avita, Possert was placed in a position of trust and confidence, and was expected to devote her full time to the management and promotion of the Company's business interests.

222.     As a result of this special relationship, Possert owed certain fiduciary duties to Plaintiffs including a duty of loyalty and honesty, and a duty not to act in any way contrary to the interests of Plaintiffs, including, but not limited to, a duty, while still employed with Avita and being compensated by the Company: (a) not to work for a competitor while working for Avita, (b) not to compete with Avita, (c) not to usurp corporate opportunities or divert business on behalf of another, (d) not to solicit Avita's customers or employees on behalf of another, (e) to help preserve customer relationships, (f) not to misuse or misappropriate the Company's confidential or trade secret information, (g) to return company property, and (h) not to be deceitful to the Company.

223.     Notwithstanding these obligations and duties, and in violation thereof, Possert breached her fiduciary duty of loyalty and honesty to Avita by, among other willful acts of misconduct, (a) simultaneously working for the benefit of PRx while still employed with Avita, (b) soliciting Avita's customers on PRx's behalf while still employed by Avita; (c) failing to return company property; and/or (d) destroying Company data on her work computer knowing it would impede the Company's investigation.

224.     As a consequence of Possert's breaches of her fiduciary duties of loyalty to Avita, Plaintiffs have suffered monetary damages and have suffered substantial and irreparable harm and are threatened with further substantial and irreparable harm due to the loss of trade secrets, confidential information, and customer goodwill, for which there is no adequate remedy at law to compensate.

225. In addition, Plaintiffs seek actual, incidental, compensatory, punitive and consequential damages, along with reasonable attorneys' fees and costs in an amount to be determined at trial.

## COUNT X
### (Aiding and Abetting Breach of Fiduciary Duty – Against Santry)

226. Plaintiffs repeat and re-allege each and every allegation contained in the preceding paragraphs of the Complaint as if fully set forth herein.

227. Santry was fully aware that Possert, as an Avita employee, owed a fiduciary duty to Avita, including, among other things, a duty (a) not to compete with Avita, (b) not to usurp corporate opportunities or divert business on behalf of another, (c) not to solicit Avita's customers or employees on behalf of another, (d) not to misuse or misappropriate the Company's confidential or trade secret information, (e) to return Avita's property upon cessation of employment, and (f) not to be deceitful to the Company.

228. Despite this knowledge, Santry aided, induced, permitted, or incentivized Possert to violate her fiduciary duties, without justification, by among other things, (a) directing or conspiring with her to work for a competing business and/or solicit Avita customers while Possert was still employed with the Company, (b) authorizing or conspiring with Possert to steal, misappropriate and/or misuse Avita's confidential information, (c) authorizing or conspiring with Possert not to return Company property, and/or (d) authorizing or conspiring with Possert to destroy Company data on her Avita work computers knowing it would impede the Company's investigation of her conduct.

229. Thereafter, Possert breached her fiduciary duties to Avita as set forth above.

230.    As an active participant and beneficiary in the scheme to solicit and recruit Avita's customers and workforce, and steal Avita's confidential and trade secret information, Santry was aware of his role in Possert's illegal activities.

231.    As a result of Santry's aiding and abetting Possert's breaches of her fiduciary duties, Plaintiffs have suffered monetary damages and have suffered substantial and irreparable harm and are threatened with further substantial and irreparable harm due to the loss of trade secrets, confidential information, and customer goodwill, for which there is no adequate remedy at law to compensate.

232.    In addition, Plaintiffs seek actual, incidental, compensatory, punitive and consequential damages, along with reasonable attorneys' fees and costs in an amount to be determined at trial.

**WHEREFORE**, Plaintiffs respectfully request that the Court enter Judgment in their favor and an Order against Defendants that grants the following relief:

1.    An injunction that preliminarily and prospectively enjoins Defendants, and all persons and/or entities acting on their behalf, for their benefit, or in active concert or participation with them (including any agents, representatives, associates and/or employees), from accessing, reproducing, using, disclosing or otherwise misappropriating any of Plaintiffs' trade secrets or other confidential or proprietary information;

2.    An injunction that preliminarily and prospectively enjoins Possert, and all persons and/or entities acting on her behalf, for her benefit, or in active concert or participation with her (including any agents, representatives, associates and/or employees), from directly or indirectly, working for any business engaged in a business competitive with or substantially similar to the business of Plaintiffs, until one year from such an order;

3.    An injunction that preliminarily and prospectively enjoins Possert, and all persons and/or entities acting on her behalf, for her benefit, or in active concert or participation with her (including any agents, representatives, associates and/or employees), from soliciting any of Plaintiffs' customers to cancel, break, or otherwise terminate or limit their contracts and/or relationships with Plaintiffs, until one year from such an order;

4.      An injunction that preliminarily and prospectively enjoins Possert, and all persons and/or entities acting on her behalf, for her benefit, or in active concert or participation with her (including any agents, representatives, associates and/or employees), from soliciting any of Plaintiffs' employees to terminate their employment with Plaintiffs, until one year from such an order;

5.      An injunction that preliminarily and prospectively enjoins Defendants, and all persons and/or entities acting on their behalf, for their benefit, or in active concert or participation with them (including any agents, representatives, associates and/or employees), from disparaging or making false claims about Plaintiffs;

6.      Orders that Defendants, and all persons and/or entities acting on their behalf, for their benefit, or in active concert or participation with them (including any agents, representatives, associates and/or employees), return to Plaintiffs all originals and copies of all files, devices, electronic media and/or documents that contain or relate to Plaintiffs' confidential, proprietary and trade secret information;

7.      Actual, incidental, compensatory, and consequential damages in an amount to be proven at trial;

8.      Exemplary damages pursuant to the DTSA and PTSA, in an amount to be proven at trial;

9.      Punitive damages in an amount to be proven at trial due to Defendants' willful and malicious conduct;

10.     Attorneys' fees as provided in the Agreements;

11.     Pre-judgment interest, and

12.     All other relief as the Court may deem just, equitable and proper.

Dated:  July 27, 2021

Respectfully submitted,

AVITA DRUGS, LLC and PHARMBLUE SERVICES, INC.,

By their attorneys,

 */s/ David J. Rowland*
David J. Rowland
drowland@seyfarth.com
SEYFARTH SHAW LLP
233 South Wacker Drive
Suite 8000
Chicago, IL 60606-6448
(312) 460-5000

James S. Yu (*pro hac vice* motion to be filed)
jyu@seyfarth.com
SEYFARTH SHAW LLP
620 Eighth Avenue
New York, NY 10018-1405
(212) 218-5500

Dawn Mertineit (*pro hac vice* motion to be filed)
dmertineit@seyfarth.com
SEYFARTH SHAW LLP LLP
Two Seaport Lane, Suite 300
Boston, MA 02210-2028
(617) 946-4800